**Neal H. BARBEE, Petitioner,**

v.

**N. Jay ROGERS and S. J. Rogers d/b/a Texas State Optical, Respondents.**

**No. B-515.**

Supreme Court of Texas.

Feb. 28, 1968.

---

Paul Regnier, Houston, Orgain, Bell & Tucker, Lawrence L. Germer and Howell Cobb, Beaumont, for petitioner.

King, Sharfstein & Rienstra, John D. Rienstra, Jr., Beaumont, for respondents.

STEAKLEY, Justice.

Petitioner sued N. Jay Rogers and S. J. Rogers, doing business as Texas State Optical, Respondents, and Texas State Optical, Inc., for damages. He alleged that he purchased contact lenses from them which were improperly fitted and that he was given improper prescriptions and instructions for their use. He further alleged that such acts constituted negligence; also, that the defendants represented to him that the lenses would be suitable for his use and benefit and not injurious but they were harmful and injurious and as such constituted a breach of warranty. The case was tried to a jury and judgment was rendered against Respondents upon findings later noticed. A take-nothing judgment was rendered in favor of the defendant, Texas State Optical, Inc., and no complaint of this action is here. The Court of Civil Appeals reversed the judgment of the trial court against Respondents and rendered judgment that Petitioner take nothing against them. 417 S.W.2d 750. We affirm.

The jury found favorably to Petitioner that he sustained an injury to the cornea of his eye following the prescription, fitting and sale to him of contact lenses furnished by Respondents; and that the lenses were not reasonably fit for use upon the surface of his eyes which caused or contributed to his injury. The jury found favorably to Respondents that they did not fail to fulfill representations that the lenses would not be injurious to Petitioner's eyes; and that although the lenses did not properly fit the natural curvature of Petitioner's eyes, which failure was negligence, such was not the proximate cause of his injury. The jury also found that Petitioner was negligent in failing to keep the lenses clean but that such was not a proximate cause of his injury; and that Petitioner did not fail to follow the wearing instructions given him by Respondents. The jury assessed Petitioner's damages in the sum of $10,000.

Petitioner attacks the holding of the intermediate court upon three points of error, the full text of which is copied in the footnote.[1] These points assert in substance that

---

1. "FIRST POINT OF ERROR. The Court of Civil Appeals erred in holding that the Defendant Partnership Texas State Optical, as a matter of law, was not liable to plaintiff Barbee upon breach of implied warranty of fitness, based upon public policy (strict liability in tort), where the contact lenses that it manufactured and furnished plaintiff were not reasonably fit for the use intended

the court erred in holding that Respondents were not liable upon the theory of strict liability in tort or for breach of a contractual implied warranty of fitness; and that the court erred in recognizing a professional relationship between Petitioner and Respondents. The main thrust of Petitioner's argument is that "This is a products liability case" in which liability "on breach of an implied warranty of fitness" is supported under our holding in McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.Sup. 1967), by the jury findings that (a) the contact lenses were not reasonably fit for use upon the surface of plaintiff's eyes; (b) the contact lenses caused injury or damage to the tissues of his eyes; and (c) such failure of the lenses to be reasonably fit was the proximate cause of the injuries. Petitioner says, "The simple fact is that defendant manufactured and sold an unfit product, contact lenses, to the plaintiff and breached the warranty of fitness imposed by public policy." Petitioner also argues under his second point that the traditional common law contractual warranty of fitness applies. The jury found, however, that Respondents did not fail to fulfill representations that the lenses would not be injurious to the eyes of the Petitioner, and we agree with Respondents that the issues found favorably to Petitioner did not submit the theory of an implied contractual warranty. Moreover, Petitioner assumes in this portion of his argument that Respondents were also the manufacturer of the contact lenses; e. g., "this is a perfect exposition of the 'consumer reliance upon the integrity of the manufacturer' stated in Shamrock Fuel and Oil Sales Co., Inc., v. Tunks," 416 S.W.2d 779 (Tex.Sup.1967). But the evidence establishes that the contact lenses were manufactured by Texas State Optical, Inc., a separate corporate entity, in whose favor a take-nothing judgment was entered by the trial court, and there is no claim that the corporate entity of the manufacturer should be disregarded. The question is thus narrowed to whether the doctrine of strict liability, which is tortious and not contractual, will be extended to the prescription, fitting and sale of contact lenses under the circumstances here shown.

Respondent, Dr. N. Jay Rogers, testified that he and his brother are licensed optometrists and compose a partnership operating eighty-four offices throughout Texas. They employ approximately one hundred twenty-five licensed optometrists and promote the sale of contact lenses by newspaper, television and radio advertisements. The contact lenses are sold for the same price regardless of the difficulty or the simplicity of the eye problems and the number of subsequent examinations which may be required. The charge is made for the product and not for the time of the optometrist. Respondents warrant to those responding to their advertisements of contact lenses that they will be properly cared for and fitted, subject to the qualification of care and use in accordance with specific instructions.

Petitioner's eyes were examined by a licensed optometrist in one of the offices of Respondents in May, 1959, and contact lenses were prescribed and subsequently fitted for him. They were unsatisfactory to Petitioner, and there followed a series of

upon the surface of plaintiff's eyes, proximately causing injury and damage to plaintiff's eyes and vision, and in ignoring the jury verdict so finding.

"SECOND POINT OF ERROR. The Court of Civil Appeals erred in holding as a matter of law, that Texas State Optical was not liable to plaintiff for breach of its contractual implied warranty of fitness of the contact lenses it sold to him; and in ignoring the jury's findings thereon found for the plaintiff.

"THIRD POINT OF ERROR. The Court of Civil Appeals erred in holding that plaintiff's purchase of contact lenses from defendant Texas State Optical, (a partnership with 84 outlets, employing 'approximately' 125 licensed optometrists) was governed by a doctrine, announced by the Court as similar to a physician-patient relationship, actionable only in the event of provable negligence."

examinations and corrections by optometrists in the employ of Respondents at offices of Respondents in the Houston area. Petitioner testified that he suffered pain and discomfort when he wore the lenses and that he ceased using them approximately sixteen months later. He subsequently moved to California where he was examined by Dr. Robert E. Christensen, a medical doctor of Ophthalmology. Dr. Christensen testified by deposition that it was his opinion that the contact lenses worn by Petitioner were of a flatter curve than the corneal curve; that he found unusual scarring in Petitioner's eyes and that "it would be logical to relate the corneal scars to the contact lenses." A contact lens manufacturer, Jack R. Case, testified that "in checking the lenses on Mr. Barbee we found that the lenses, in our opinion, would be too large and too thick."

Article 4552 [2] defines the practice of optometry as follows:

"The practice of optometry is defined to be the employment of objective or subjective means, without the use of drugs, for the purpose of ascertaining and measuring the powers of vision of the human eye, and fitting lenses or prisms to correct or remedy any defect or abnormal condition of vision. Nothing herein shall be construed to permit optometrists to treat the eyes for any defect whatsoever in any manner nor to administer nor to prescribe any drug or physical treatment whatsoever, unless such optometrist is a regularly licensed physician or surgeon under the laws of this State. Nothing herein shall be construed to prevent selling ready-to-wear spectacles or eye glasses as merchandise at retail, nor to prevent simple repair jobs."

Article 4565d provides that "the fitting of contact lenses shall be done only under the direct supervision of a licensed physician or licensed optometrist * * *." Article 4566 provides that the Act shall not apply to persons who sell spectacles and eye-glasses as merchandise, these being defined in Article 4565e as meaning "merchants who do not practice optometry, or offer to practice optometry, but who sell spectacles or eye-glasses as merchandise * * *."

The licensed optometrist, such as Respondents and their employees, is thus enjoined by statute from treatment of the eyes and from the administration or prescription of drugs. The service he renders is the prescription and fitting of corrective devices for visual defects. It is shown by the evidence that the optometrist performs this service by means of mechanical instruments in the use of which he has special training. These instruments are designed to disclose the nature and extent of the eye defect, together with the type of lens required for correction. In brief they are described in the testimony as a retinoscope, which objectively measures the accuracy of vision, i. e., whether a person is farsighted or nearsighted or has an astigmatism; a phorooptometer, which measures the error of refraction; an ophthalmoscope, by which the structure of the eye is examined and its tissues observed; and a keratometer, which measures the corneal curve, i. e., the actual curve of the front of the eye. It further appears from the evidence that there are two methods of fitting contact lenses, and there is no way to predetermine whether a particular contact lens curve or size will be easily adapted to the patient or can ever be adapted to him. The acts of prescription and fitting are described as an art with many variables and call for an exercise of judgment by the practitioner.

It is apparent that the activities of Respondents fall between those ordinarily associated with the practice of a profession and those characteristic of a merchandising concern. A professional relationship is present in the facts that contact lenses are prescribed and fitted by a licensed optome-

2. The references are to the statutes as they appear in Vernon's Annotated Texas Civil Statutes.

trist after examination of the eyes and in the exercise of his judgment. A merchandising relationship is suggested by the multiple offices of Respondents throughout the State; by their advertising and sales techniques designed to promote the sale of contact lenses at a predetermined and advertised price; and by their standardization of procedures and methods. Petitioner argues that the latter in effect destroys the statutory distinction between the professional act of fitting lenses or prisms to correct or remedy visual defects and the merchandising act of selling corrective eye devices. Respondents, on the other hand, point to this statutory distinction as making clear that the licensed optometrist is not considered a mere merchant.

In McKisson v. Sales Affiliates, Inc., supra, we extended the rule of strict liability applicable to foodstuffs for human consumption, Decker and Sons, Inc. v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479 (1942), to defective products which cause physical harm to persons. In so doing, we adopted the rule of the Torts Restatement.[3] It is to be noted that the jury findings here closely parallel those in *McKisson*. In our opinion, however, and we so hold, the rule of strict liability is inapplicable. Respondents and the licensed optometrists in their employ exercise skill and judgment in the examination, prescription and fitting process whereby it is sought to remedy visual abnormalities by the use of curved lenses or prisms. The failure here is not attributable to the product itself, i. e., the contact lenses, but to the professional and statutorily authorized act of "measuring the powers of vision" of Petitioner's

eyes and "fitting lenses * * * to correct or remedy * * * [his] defect or abnormal condition of vision." This is not the act of one selling a "product in a defective condition unreasonably dangerous to the user" in the terms of the Torts Restatement. It is the act of one deemed in law to have the competence to remedy a visual defect by furnishing particularly prescribed contact lenses. Apart, then, from Respondents way of practicing optometry, the fact remains that the contact lenses sold to Petitioner were designed in the light of his particular physical requirements and to meet his particular needs. Presumably, and insofar as this record shows, they were not in existence when Petitioner sought the services of Respondents. They were not a finished product offered to the general public in regular channels of trade. The considerations supporting the rule of strict liability are not present. Petitioner cites no case authority for so extending the rule, and we have found none in our research. In addition to the disqualifying factor of the professional relationship, Petitioner's claim for application of the rule is not premised on any defect in the lenses as such, nor was it contemplated that Petitioner would use them without changes or adjustments to fit his needs. The miscarriage, if such there was, rests in the professional acts of Respondents and not in the commodity they prescribed, fitted and sold. As to this, the jury found that the negligence of Respondents in failing to properly fit the natural curvature of Petitioner's eyes was not the proximate cause of his injury.

The judgment of the Court of Civil Appeals is affirmed.

---

3. Restatement (Second) of Torts, § 402A (1964):
  "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
  "(a) the seller is engaged in the business of selling such a product, and
  "(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
  "(2) The rule stated in Subsection (1) applies although
  "(a) the seller has exercised all possible care in the preparation and sale of his product, and
  "(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."