# IN THE SUPREME COURT OF TEXAS

No. 14-0650

CENTERPOINT BUILDERS GP, LLC AND CENTERPOINT BUILDERS, LTD.,
PETITIONERS,

v.

TRUSSWAY, LTD., RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS

JUSTICE BOYD, joined by JUSTICE JOHNSON, dissenting.

Centerpoint Builders seeks indemnity from Trussway, Ltd., under the Texas Products Liability Act. The sole issue in this interlocutory appeal is whether Centerpoint qualifies under the Act as a "seller" of Trussway's allegedly defective roof truss. The first time this Court addressed the Act's indemnity provisions it warned that, "when we stray from the plain language of a statute, we risk encroaching on the Legislature's function to decide what the law should be." *Fitzgerald v. Advanced Spine Fixation Systems, Inc.*, 996 S.W.2d 864, 866 (Tex. 1999). I conclude that the Court strays from the statute's plain language in this case by excluding from the definition of "seller" those persons whose sales of a product are "incidental" to its sales of services. *Ante* at ___. The statute's definition of "seller" says nothing about sales that are "incidental" to sales of services. Instead, it includes all those who are "engaged in the business of" selling the product, and nothing in the ordinary, common meaning of the phrase "engaged in the business" excludes business

activities that are "incidental" to other business activities in which the person is also engaged. Because the evidence here establishes that Centerpoint was "engaged in the business of" selling trusses, the Act's plain language makes it a "seller" entitled to indemnity regardless of whether those sales were "incidental" to its other business activities. Because the Court holds otherwise, I respectfully dissent.

## I.
## Introduction

Centerpoint was the general contractor for the construction of an apartment complex on property owned by Glenmont Madison Beaumont, LLC. Pursuant to the contract, Centerpoint purchased preassembled roof trusses[1] directly from Trussway, Ltd., and subcontracted with Sandidge & Associates to install them. Sandidge, in turn, contracted with Merced Fernandez to assist with the installation. During the construction, Sandidge's crew moved the trusses into place on top of what would become the second-floor ceiling and left them laying there flat like "fallen dominoes" until they could be raised and installed. While carrying a piece of sheetrock and using the uninstalled trusses like a "platform" above the second floor, Fernandez stepped on one of the trusses, the board beneath him broke, and he fell and suffered permanent, debilitating injuries.

---

[1] According to the parties and the record, trusses are wooden structures typically formed by fastening multiple 2x4 boards together using a particular design that enables them to bear the weight of a roof suspended above the ceiling below. Builders (or their framing subcontractors) sometimes construct trusses themselves by nailing the necessary boards together at the jobsite. Alternatively, the builder may purchase fully constructed trusses from a truss manufacturer like Trussway, and then modify them at the jobsite as necessary, as Centerpoint did here. By suspending the roof above the ceiling, trusses create attic space above the floor below. After the framers install the trusses, a drywall (or "sheetrock") subcontractor may install drywall along the trusses' vertical boards to finish-out the attic space.

Fernandez sued Glenmont, Centerpoint, Sandidge, and Trussway, alleging that the truss that broke beneath him was unreasonably dangerous and that "the Defendants" (including Centerpoint) "designed, manufactured, marketed, distributed[,] and utilized" the product and "placed [it] into the stream of commerce." Centerpoint and Trussway filed cross-claims against each other seeking indemnity from the other under the Texas Products Liability Act. TEX. CIV. PRAC. & REM. CODE §§ 82.001–.008. Both Centerpoint and Trussway then filed cross-motions for summary judgment on their indemnity claims.

The trial court denied Trussway's summary-judgment motion and granted partial summary judgment for Centerpoint, holding that, for purposes of indemnity under the Act, Centerpoint was a "seller" of the allegedly defective truss. On Trussway's agreed interlocutory appeal, the court of appeals reversed, and this Court now affirms that court's judgment. In support of its conclusion that Centerpoint was not a seller of the allegedly defective truss, the Court cites to the text of the Products Liability Act, our precedents construing that text, and other precedents that address whether a party is a "seller" under common-law strict-liability principles. In my view, none of these authorities support the Court's conclusion.

## II.
## The Text

The Texas Products Liability Act requires a "manufacturer" to "indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable." TEX. CIV. PRAC. & REM. CODE § 82.002(a). The parties agree that Trussway was the "manufacturer" of the allegedly

3

defective truss, that this is a "products-liability action," and that Centerpoint seeks indemnification for a "loss" arising out of this action. The only issue is whether Centerpoint was a "seller" of the allegedly defective truss.

Because the Products Liability Act expressly defines the term "seller," we need not decide in this case whether Centerpoint was a seller of trusses under the term's common, ordinary meaning.[2] When construing a statute, we do not rely on a term's ordinary meaning if a "different meaning is supplied by legislative definition." *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). If the statute defines a term, we are "bound to construe that term by its statutory definition only." *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002) (citing TEX. GOV'T CODE § 311.011(b)). The Products Liability Act expressly defines the term "seller" to mean "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof." TEX. CIV. PRAC. & REM. CODE § 82.001(3). We must decide whether Centerpoint is a seller under this definition.

---

[2] The Court suggests that the record here is "devoid of evidence" that Centerpoint was a "seller" of trusses, and that the evidence "indicates that Centerpoint was selling construction services rather than trusses or other building materials." *Ante* at ___. To the extent the Court means to suggest that there is no evidence that Centerpoint was a truss "seller" under the common, ordinary meaning of that term, I disagree. In ordinary usage, a "seller" is simply someone "who sells or contracts to sell goods," or even more generally, "a person who sells anything; the transferor of property in a contract of sale." *Seller*, BLACK'S LAW DICTIONARY (10th ed. 2014) (hereinafter BLACK'S 10th ed.). Under their standard American Institute of Architects form contract, Centerpoint agreed to complete "the Work," which included the obligation to "provide and pay for" all "materials" necessary to "fulfill [Centerpoint's] obligations." The contract required Centerpoint to warrant to Glenmont that all such materials were "of good quality and new" and "free from defects." In exchange for the Work, Glenmont agreed to pay Centerpoint a lump sum that included amounts to "cover the cost to [Centerpoint] of materials," including materials to be "incorporate[d] in the completed construction." The contract specified the amount Glenmont would pay for the floor and roof trusses. And the contract expressly provided that all payments for all materials would be conditioned on Glenmont becoming the legal owner of those materials. In short, the parties agreed that Centerpoint would purchase and provide the trusses, Glenmont would pay Centerpoint for the trusses, and Glenmont would then own the trusses. And that is exactly what happened.

4

It is undisputed that Centerpoint "distributed"[3] the truss in the stream of commerce[4] for use or consumption, and did so for a commercial purpose. The Court concludes, however, that Centerpoint was not a seller because it was not "*engaged in the business of* commercially distributing" trusses. *Ante* at ___ (emphasis added). Because the Act does not define "engaged in the business of," the Court seeks the common ordinary meaning of that phrase in *Black's Dictionary*, which defines

- "engaged" as "to employ or involve oneself," "to take part in," or "to embark on," *ante* at ___ (quoting *Engage*, BLACK'S 10th ed.);

- "business" as a "commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain," *ante* at ___ (quoting *Business*, BLACK'S 10th ed.); and

- "doing business" as "the carrying out of a series of similar acts for the purpose of realizing a pecuniary benefit," *ante* at ___ (quoting *Doing Business*, BLACK'S 10th ed.).

Relying on these dictionary definitions to inform the meaning of the "entire phrase . . . 'engaged in the business of,'" the Court holds that "one is not 'engaged in the business of' selling a product if providing that product is *incidental* to selling services." *Ante* at ___ (emphasis added). Applying that holding, the Court concludes that Centerpoint's sales of trusses were "incidental to its contract to provide the services necessary to construct a building," *ante* at ___ (quoting *Barham v. Turner Constr. Co. of Tex.*, 803 S.W.2d 731, 738 (Tex. App.—Dallas 1990, writ denied)),

---

[3] To "distribute" means to "deliver," to "spread out; to disperse." *Distribute*, BLACK'S 10th ed.

[4] *See Fresh Coat, Inc. v. K–2, Inc.*, 318 S.W.3d 893, 899 (Tex. 2010) (rejecting argument that contractor "did not place [stucco product] into the stream of commerce since [the product] was applied to walls that were part of newly constructed homes").

5

because "Centerpoint did not set prices on the materials to achieve a gain or profit," *ante* at ___, and "Centerpoint used innumerable building materials" in addition to the trusses, *ante* at ___. The Court then goes on to hold that "a general contractor who is neither a retailer nor a wholesale distributor of any particular product is not necessarily a 'seller' of every material incorporated into its construction projects . . . ." *Ante* at ___. I disagree, because nothing in the statute's definition of "seller" or in the common meaning of "engaged in the business of" supports the Court's two holdings or the evidentiary factors on which it relies.

## A.    First Holding: "Incidental" Sales

The Court's first holding is that "one is not 'engaged in the business of' selling a product if providing that product is *incidental* to selling services." *Ante* at ___ (emphasis added). Although the Court does not explain what it means by "incidental," that term commonly refers to something "[s]ubordinate to something of greater importance" or having "a minor role" within a greater enterprise. *Incidental*, BLACK'S 10th ed. Presumably, under the Court's incidental-sales test, an entity is not "engaged in the business of" selling a product if that business activity is "subordinate" in importance to, or plays only a "minor role" compared with, other business activities in which the entity is also engaged. Nothing in the common meaning of "engaged in the business" or in the statutory definition of "seller" supports this test.

An entity can of course be simultaneously engaged in more than one business activity,[5] and one or more of those activities will likely be more important or primary to the entity or to a

---

[5] *See, e.g.*, *Gregory v. Roedenbeck*, 174 S.W.2d 585, 587 (Tex. 1943) (noting that persons engaged in the oil-and-gas-well-supply business may also be "engaged in other business"); *Hous. Life Ins. Co. v. Dabbs*, 125 S.W.2d 1041, 1043–44 (Tex. 1939) (noting that a corporation can "engage[] in a business foreign to its charter powers").

particular transaction than another. Similarly, the entity may engage more regularly or continuously in one or more business activities than another. But that one business activity is less important or primary or that the entity engages in it less regularly or frequently does not mean it is not "engaged in the business of" that activity. Under the common, ordinary meaning, the entity is still "engaged in" (i.e., "employed," or "involved" or "taking part" in, *see Engage*, BLACK'S 10th ed.) that "business" (i.e., the "commercial enterprise carried on for profit" or "gain," *Business*, BLACK'S 10th ed.), as those terms are commonly understood.

Numerous Texas statutes confirm that the common meaning of "engaged in the business of" does not exclude activities that are "incidental" to a business's other activities.[6] Many statutes, for example, expressly apply only to persons that are "primarily" or "principally" engaged in the business of a particular activity.[7] And many other statutes expressly apply only to those who "continuously" or "regularly" engage in a particular business activity or that conduct at least a certain minimum amount or volume of the business.[8] In fact, some statutes expressly apply only

---

[6] This Court regularly and properly relies on "the use and definitions of [a] word in other statutes" to determine the word's common, ordinary meaning. *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014) (plurality op.).

[7] *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 27.010(b) (providing that the Texas Citizens Participation Act does not apply to certain legal actions against "a person *primarily* engaged in the business of selling or leasing goods or services" (emphasis added)); TEX. GOV'T. CODE § 27.060(c)(2) (requiring that Supreme Court adopt justice-court rules for "specific procedures for an action by a person *primarily* engaged in the business of lending money at interest" (emphasis added)); TEX. OCC. CODE § 1052.003(a)(12) (authorizing a person who "is *primarily* engaged in the business of park and recreation planning" to engage in the practice of landscape architecture (emphasis added)); TEX. TRANSP. CODE § 396.001(4) (defining "Recycling business" as a "business *primarily* engaged" in specific activities (emphasis added)); TEX. TAX CODE §§ 171.1011(g-8), (g-10), (g-11), (w-1) (imposing unique tax obligations on taxable entities that are "*primarily* engaged in" particular businesses (emphasis added)).

[8] *See, e.g.*, TEX. ELEC. CODE § 253.103(a)(1) (prohibiting a corporation from making a loan to a candidate, officeholder, or political committee for campaign or officeholder purposes unless "the corporation has been legally and *continuously* engaged in the business of lending money *for at least one year* before the loan is made" (emphases added)); TEX. FIN. CODE § 308.001 (applying chapter only to persons "*regularly* engaged in the business of extending

7

to entities that are *both* primarily or principally *and* regularly engaged in a particular business activity.[9]

As the Court itself explains, we must presume that "the Legislature deliberately and purposefully selects words and phrases it enacts, as well as deliberately and purposefully omits words and phrases it does not enact." *Ante* at ___ (quoting *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012)). The fact that many statutes include words that limit the scope of the phrase "engaged in the business of" indicates that statutes that omit those words are not so limited. If, as the Court asserts, the common meaning of "engaged in the business of" does not include business activities that are only "incidental" to the business or transaction, there would be no need to limit statutes to those who are "primarily" or "principally" engaged in a particular business, or who engage in the business "regularly" or "continuously." Under the Court's construction, a statute that applies to entities that are "engaged in the business of" a particular activity already excludes those that only "incidentally" engage in that activity. If that were true, there would be no need for statutes to modify the phrase "engaged in the business" with terms like "primarily," "principally," or "regularly," and those terms would be meaningless and superfluous in all the statutes that use them. Of course, we must not construe statutes in ways that render

___

credit . . . primarily for personal, family, or household use" (emphasis added)); TEX. OCCUP. CODE § 2352.001(3) (defining "Dealer" as "a person engaged in the business of buying, selling, . . . or exchanging at least five vessels, motorboats, or boat motors during a calendar year"); TEX. PARKS & WILD. CODE § 31.003(7) (defining "Dealer" as "a person engaged in the business of buying, selling, . . . or exchanging at least five vessels, motorboats, or outboard motors during a calendar year").

[9] *See, e.g.*, TEX. FIN. CODE § 345.001(1)(C) (defining "credit card issuer" to exclude a person who is "*regularly* and *principally* engaged in the business of lending money for personal, family, or household purposes" (emphases added)); TEX. WATER CODE § 26.342(7)(E) (defining "lender" to include entities that are "*regularly* engaged in the business of extending credit and if extending credit represents the *majority* of the entity's total business activity" (emphases added)).

8

statutory terms "meaningless or superfluous." *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008).

I believe we must acknowledge and respect the fact that the Products Liability Act's definition of "seller" includes all those "engaged in the business" of selling a product, and does not employ limiting words like "primarily" or "regularly" or, as the Court holds today, "non-incidentally." The Products Liability Act thus applies to all persons "engaged in the business" of selling a product regardless of whether their engagement in that business is a primary, regular, or merely incidental activity. By construing "engaged in the business" to exclude those whose relevant activities are incidental to other business activities, the Court construes the Act's definition of "seller" as if it included terms like "primary," "principally," and "regularly" when it does not. Of course, we must not do this when construing a statute either. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 631 (Tex. 2008) ("[C]hanging the meaning of the statute by adding words to it, we believe, is a legislative function, not a judicial function.").

Under the ordinary, common meaning of "engaged in the business" and the Act's language, a person is a "seller" under the Products Liability Act if the person is employed or involved (that is, "engaged") in a commercial enterprise for profit or gain (that is, a "business") in which the person distributes or places for use or consumption a product or component part into the stream of commerce for any commercial purpose. *See* TEX. CIV. PRAC. & REM. CODE § 82.001(3); *Engage*, *Business*, *Doing Business*, BLACK'S 10th ed. Because the Act's definition of "seller" does not include additional language like "primarily," "principally," "regularly," or "non-incidentally," the question of whether the entity's distribution or placement of the product is "incidental" in

9

comparison to its other business activities is irrelevant to determining whether it is "engaged in the business" at issue.

**B.      Second Holding: Contractors and Construction Projects**

The Court's second, more specific holding is that "a general contractor who is neither a retailer nor a wholesale distributor of any particular product is not necessarily a 'seller' of every material incorporated into its construction projects . . . ." *Ante* at ___. While I agree with this holding as worded, it merely begs the question of when a general contractor is or is not a "seller" of a product it incorporates into a construction project. Under the Products Liability Act's plain language, the answer is that a general contractor *is* a "seller" of a product if it is "engaged in the business of distributing or otherwise placing" the product "in the stream of commerce for use or consumption," and does so "for *any* commercial purpose." TEX. CIV. PRAC. & REM. CODE § 82.001(3) (emphasis added).

To the extent the Court suggests by this holding that the Act's definition of "seller" applies differently to a "general contractor" than to others who sell products, I disagree. The statutory definition includes every "person" who is "engaged in the business," TEX. CIV. PRAC. & REM. CODE § 82.001(3), and the Court makes no effort to explain how the Act distinguishes general contractors from any other "person." Nothing in the Act or in the common meaning of "engaged in the business of" imposes different criteria on "general contractors" than on builders, subcontractors, retailers, or wholesalers, and nothing in the common meaning or the Act conditions "seller" status on how the product is ultimately used.

10

To the contrary, as discussed further below, this Court has held that the fact that the entity is a contractor that provides services through which it incorporates the product into a construction project does not preclude it from being a "seller" of that product. *Fresh Coat*, 318 S.W.3d at 899. Under the Act's language, any "person" (thus, any general contractor, subcontractor, retailer, wholesaler, etc.) "who is engaged in the business of distributing or otherwise placing, for *any* commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof" is a seller, regardless of how the product is used. TEX. CIV. PRAC. & REM. CODE § 82.001(3) (emphasis added).

## C.      Evidentiary Factors

The Court identifies two facts that it believes demonstrate that Centerpoint's placement of trusses into the stream of commerce for commercial purposes was merely "incidental" to its primary business obligations: (1) Centerpoint did not price the trusses to achieve a gain or profit, *ante* at ___, and (2) trusses were just one of "innumerable" products that Centerpoint sold, *ante* at ___. In my view, because the Act does not support the Court's incidental-sales test, these factors (which the Act never mentions) are irrelevant to the question of whether Centerpoint was a "seller" under the Act. And to the extent they are relevant at all, they merely demonstrate that the common, ordinary meaning of the phrase "engaged in the business of" does not support the Court's new incidental-sales test.

Regarding the Court's first factor, nothing in the Act or the ordinary meaning of "engaged in the business of" requires that the sale of the specific product at issue must be designed to achieve a financial "gain" or "profit." Under the common, ordinary meaning of the phrase, even a non-

11

profit corporation like the Salvation Army may be "engaged in the business" of selling products, even though it is not seeking to "achieve a profit" from those sales. *See, e.g.*, *City of San Antonio v. Salvation Army*, 127 S.W. 860, 862 (Tex. Civ. App.—San Antonio 1910, writ ref'd) (noting the Salvation Army's legislative charter provides that the "proceeds of *said business* shall be devoted to the religious, charitable, educational or missionary purposes of the Salvation Army" (emphasis added)). The statutory definition provides no basis for excluding a non-profit or not-for-profit organization from the Act's indemnity provisions.

More specifically, neither the Act nor the common meaning support the Court's suggestion that a party is "engaged in the business of" selling a particular product only if it seeks a "gain or profit" from the sales of *that specific product*. If a hardware store, for example, decides to sell all hammers for a price below the company's costs, it is still "engaged in the business of" selling those hammers. When cell-phone carriers sold iPhones below cost to attract customers into service contracts, they were still "engaged in the business of" selling iPhones, even if their primary business was providing cellular *services* and they realized no financial gain from the sales of the phones. *See* Matt Scully & Scott Moritz, *iPhones go from T-Mobile Loss Leader to New Source of Cash*, BLOOMBERG (Apr. 30, 2015, 6:07 PM), http://www.bloomberg.com/news/articles/2015-04-30/t-mobile-changes-iphones-from-loss-leaders-to-source-of-finance. And when Wal-Mart sold gasoline as a loss-leader in an effort to attract shoppers into their stores, it was still "engaged in the business of" selling gasoline, even if it did not seek a profit or realize a gain from those sales. *See* Brad Tuttle, *Walmart's New Loss Leader: Cheap Gas*, TIME, (June 29, 2011), http://business.time.com/2011/06/29/walmarts-new-loss-leader-cheap-gas. In the same way, when

Centerpoint sells trusses or other building materials at cost in connection with a contract to build an apartment complex, it is still "engaged in the business of" selling those building materials. Even under the dictionary definitions on which the Court relies, the seller need only be seeking some "gain" or "pecuniary benefit" from the transaction as a whole to be "engaged in the business," even if it may not seek or "achieve a gain or profit" from the specific sale at issue.

Regarding the Court's second factor—that trusses were only one of "innumerable" products that Centerpoint sold—nothing in the Act supports the Court's reliance on this factor either. The Act's definition of "seller" expressly includes a person who distributes a product "for *any* commercial purpose." TEX. CIV. PRAC. & REM. CODE § 82.001(3) (emphasis added). If a quick-lube shop whose primary business is to offer oil-change *services* sells oil, oil additives, oil filters, fuel filters, air filters, windshield-wiper blades, and "innumerable" other products, the shop is "engaged in the business" of selling each of those products, even if those sales are "incidental" to its oil-change *services* and even if those services are its "primary responsibility" to its customer. If the purpose of the sale is to provide the product in connection with the party's services, the party still distributes the product for a "commercial purpose," and the Act expressly provides that *any* commercial purpose qualifies. *See id.* If a Jiffy Lube only occasionally sells a wiper blade, a hardware store sells only a few auger bits, an AT&T store sells only a few screen protectors, or a Wal-Mart store only occasionally sells a Hula Hoop, they are still "engaged in the business" of selling those products, even if the products are only one of "innumerable" other products that each of them sells.

The apartment project Centerpoint was constructing when Fernandez was injured was one

of "four or five" similar construction projects that Centerpoint had going at the time. And as the Court itself acknowledges, it "is the nature of a general contractor's business when it builds based on custom designs and specifications" to provide "innumerable construction products and materials." *Ante* at ___. Under the ordinary meaning of "engaged in the business," selling trusses and other building materials is part of the business in which Centerpoint engaged, even if it is an "incidental," and not the "primary," part. Although Centerpoint may be only "incidentally"—and not "primarily" or "regularly"—engaged in the business of selling trusses, it is nevertheless "engaged in the business" of selling trusses. I would apply the unambiguous statutory language and conclude that Centerpoint is a "seller" of trusses under the Products Liability Act. TEX. CIV. PRAC. & REM. CODE § 82.001(3).

### III.
### Chapter 82 Precedent

In addition to its purported reliance on the statutory text, the Court relies on our precedent addressing the Products Liability Act to support its conclusion that Centerpoint does not qualify as a "seller." Although we have addressed the Act's definition of "seller" on a number of occasions,[10] the key precedent here, the one on which both parties rely most heavily, and the one

---

[10] The Court first addressed the Act's definition of "seller" in *Fitzgerald*. 996 S.W.2d at 867. In that case, the party seeking indemnity sold the manufacturer's product but not the specific product that allegedly harmed the plaintiffs and was thus dismissed from the suit. *Id.* at 865. Contesting any indemnity obligation, the manufacturer argued that, to qualify as a "seller," the party had to be in the "chain of distribution" of the specific allegedly defective product. *Id.* We disagreed, noting that the Act "does not explicitly require that the seller be proven to have been in the chain of distribution." *Id.* at 867. We rejected the manufacturer's interpretation because it "would have us judicially amend the statute to add an exception not implicitly contained in the language of the statute." *Id.* We laid the proper foundation for interpreting and applying the Act by noting that only "truly extraordinary circumstances showing unmistakable legislative intent should divert us from enforcing the statute as written." *Id.*

More recently, we acknowledged that the Act imposes "'a new, distinct statutory duty' of indemnification because it is, by its terms, 'in addition to any duty to indemnify established by law, contract, or otherwise.'" *Gen. Motors Corp. v. Hudiburg Chevrolet, Inc.*, 199 S.W.3d 249, 255 (Tex. 2006) (footnote omitted) (first quoting

the Court addresses, is *Fresh Coat*, 318 S.W.3d 893. We held in *Fresh Coat* that a construction contractor that installed synthetic stucco products on the exterior walls of new-build homes *did* qualify as a "seller" of those products even though it purchased the products from the manufacturer and provided all the labor and services to install the products on the homes. *Id.* at 899. Noting that the Act "anticipates that a product seller may also provide services," we concluded that "installation services do not preclude [a company] from also being a seller." *Id.*

The Court claims that *Fresh Coat* is unhelpful here because the "contractor at issue in *Fresh Coat* sold and installed a particular product" while Centerpoint was "a general contractor constructing an improvement to real property." *Ante* at ___. I find the Court's attempt to distinguish *Fresh Coat* to be both incomplete and unconvincing. The Court begins by noting that the contract in *Fresh Coat* "required Fresh Coat to provide 'labor, services and/or materials, equipment, transportation, or facilities' necessary to apply and finish the synthetic stucco." *Ante* at ___ (citing *Fresh Coat*, 318 S.W.3d at 899). Under the Court's analysis in *Fresh Coat*, however, there are no relevant differences between Fresh Coat's contractual obligations and Centerpoint's (to provide "the construction and services required by the Contract Documents," including "all other labor, materials, equipment and services" necessary "to fulfill its obligations").

Although the Court suggests today that the Fresh Coat contract placed those products on "equal footing" with the services while Centerpoint's contract did not, *ante* at n.8, the Court placed no value on that point in *Fresh Coat*. In both cases, the contract required the party to provide both

---

*Fitzgerald*, 996 S.W.2d at 866; then quoting TEX. CIV. PRAC. & REM. CODE § 82.002(e)(2)). We thus acknowledged that our preconceptions based on common law liabilities and indemnity cannot control our construction of the Act's provisions. *See id.* at 255–57. And most recently, we recognized that the Act "*broadly* defines [the term] 'seller.'" *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 491 (Tex. 2014) (emphasis added).

15

the allegedly defective "materials" and the services to properly install them in the construction project. Nothing in *Fresh Coat* suggests that the fact that Centerpoint contractually agreed to provide other materials and services requires a conclusion that it was not "engaged in the business" of providing the materials that were later alleged to be defective. Nor does anything in the Act support that proposition.

Next, the Court notes that "Fresh Coat purchased [the synthetic stucco products] from their manufacturer and installed them pursuant to its contract with the builder." *Ante* at ___ (citing *Fresh Coat*, 318 S.W.3d at 895). But the Court makes no effort to explain how Fresh Coat's installation of the stucco products pursuant to its contract with the builder is different from Centerpoint's installation of the trusses pursuant to its contract with Glenmont. *See ante* at ___. The product at issue in *Fresh Coat* was a combination of component products that the installer had to properly combine, apply, and finish in a particular way at the time of installation. *See Fresh Coat*, 318 S.W.3d at 899 (explaining that the synthetic stucco system included a "base coat, mesh, and finish coat"). Here, by contrast, Centerpoint did not rely on Trussway's instructions to "completely or partially assemble" the trusses because Trussway provided the trusses fully assembled. All Centerpoint had to do was install the trusses, and as even Trussway admits, "no builder needs instructions on putting up a truss any more than it needs to be told how to drive a nail." In short, Fresh Coat's sale of the stucco products was far more "incidental" to the services Fresh Coat provided to install the stucco products than Centerpoint's sale of the truss was to the services it provided to install the truss.

Next, the Court states, "In holding that Fresh Coat was a seller, we relied in part on witness

16

testimony that the company was 'in the business of providing [the] products combined with the service of [the] installation.'" *Ante* at ___ (quoting *Fresh Coat*, 318 S.W.3d at 899). While the Court correctly quotes from the *Fresh Coat* opinion, the Court did not find such conclusory testimony determinative in *Fresh Coat*, nor could it have. *See, e.g.*, *Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013) (rejecting testimony that legal malpractice resulted in reduced settlement as conclusory and mere *ipse dixit*); *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 161 (Tex. 2012) (rejecting property owner's valuation testimony as conclusory and speculative). While the testimony may have been worth noting, it was meaningless in the absence of evidence supporting that conclusory assertion. Here, the evidence established that Centerpoint was engaged in the business of selling trusses even if no witness expressly stated that it was.

Finally, the Court simply concludes that, in *Fresh Coat*, "we were not required to consider how and if the analysis would be affected when the person seeking seller status were a general contractor constructing an improvement to real property." *Ante* at ___. But Fresh Coat was also a contractor constructing an improvement to real property, and nothing in the Act's definition of "seller" or in our opinion in *Fresh Coat* supports the Court's conclusion that general contractors should be treated differently from any other contractor, person, or entity.

The Court's discussion of *Fresh Coat* is unconvincing, but what the Court does not say about *Fresh Coat* is even more illuminating. The Court makes no effort to distinguish or analogize *Fresh Coat* in light of the incidental-sales test it adopts and applies today. That is because the Court did not apply any incidental-sales test when it applied the Act's plain language in *Fresh Coat*. The *Fresh Coat* Court never considered whether the contractor's obligation to provide the

17

product was "primary" or "incidental," never discussed whether the contractor derived its "profits" or "gains" from its products sales or its installation services or both, and never mentioned whether the contractor sold products other than those alleged to be defective. *See Fresh Coat*, 318 S.W.3d at 899. Those questions, which the Court finds determinative in today's case, do not appear in the Act and thus were simply not relevant to the Court's conclusion that Fresh Coat qualified as a "seller."

Instead, when the *Fresh Coat* Court addressed the specific question of whether the contractor could be a "seller," it expressly agreed with the court of appeals' holding in that case that the Act's "definition of 'seller' does not exclude a seller who is also a service provider, nor does it require the seller to only sell the product." *Id.* at 899 (quoting *K–2, Inc. v. Fresh Coat, Inc.*, 253 S.W.3d 386, 393 (Tex. App.—Beaumont 2008)). And it specifically recognized that "homebuilders and their contractors" could seek indemnity as sellers under the Act. *Id.* at 898–99.

Ultimately, the Court agrees with Trussway's argument that, under *Fresh Coat*, Centerpoint could not be a truss seller because it sold "'construction services,' not building materials." *Ante* at ___. But it does not explain why it believes that is an either/or proposition, as if Centerpoint's status as a construction-services seller precludes it from also being a truss seller. The Court expressly rejected this very approach in *Fresh Coat*, holding that "the company's installation services do not preclude it from also being a seller." *Fresh Coat*, 318 S.W.3d at 899. Applying that holding here, Centerpoint, like Fresh Coat, was "engaged in the business" of distributing the trusses it undeniably sold, and is therefore a "seller" under the Act even though it also provided services.

18

# IV.
## Strict-Liability Cases

Ultimately, the Court relies not on our own applicable decision in *Fresh Coat* but on other courts' decisions addressing the issue of whether a service provider is a "seller" of products under common-law strict-liability principles. This case, however, presents the issue of who is a seller under the Products Liability Act, not who is a seller under common-law strict-liability principles. I believe it is unnecessary and imprudent to address the difficult and complicated common-law issue that this case does not raise.

The common-law principle and the Act's indemnity provisions address two separate but related issues. Under the common law, "the seller of a defective product is subject to strict liability for damages the product causes even though the defect was not his fault, but he is generally entitled to indemnity from the manufacturer by statute and by common law." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 446–47 (Tex. 2009) (footnote omitted). The cases on which the Court relies address whether and when a party that provides or distributes a product in connection with its service is considered to be a "seller" that is strictly liable for any defect in the product under the common law. This is an issue that has been the subject of extensive discussion and debate throughout the country for many years. *See, e.g.*, William C. Powers, Jr., *Distinguishing Between Products and Services in Strict Liability*, 62 N.C. L. REV. 415 (1984).[11]

---

[11] In his article published more than thirty years ago, President Powers explained that one rationale for imposing strict liability is the recognition that plaintiffs often lack access to the evidence necessary to prove the facts that would allow them to recover under fault-based liability theories. *Id.* Powers proposed that courts should decide whether the defendant in a "hybrid product-service case[]" is a "seller" subject to strict liability by inquiring "whether it is the type of case that evokes the proof rationale of strict products liability." *Id.* at 430. In his view, many transactions that involve the provision of both products and services "can be classified themselves fairly easily as product or service" based on the proof rationale. *Id.* at 431. If a plumber who installs a water heater is sued, for

19

As the Court notes, other courts have held, at least generally, that a service provider that also distributes products is not a "seller" subject to strict liability under the common law if:

- the sale of the product was only "incidental" to the service contract and the provider only "occasional[ly]" sold the products at issue, *Barham*, 803 S.W.2d at 738;

- the provider does not place the product in the stream of commerce, *Peterson Homebuilders, Inc. v. Timmons*, No. 14-03-00400-CV, 2004 WL 1660936, at *5 (Tex. App.—Houston [1st Dist.] July 27, 2004, no pet.) (mem. op.) (concluding without discussion that a subcontractor who built a foundation pad for a house "did not place this structural pad in the stream of commerce");

- the provider simply "used" the product when constructing a project, *Maack v. Res. Design & Constr., Inc.*, 875 P.2d 570, 581 (Utah Ct. App. 1994) (holding that a subcontractor was not a seller because it "simply utilized these component parts when constructing the residence—they were not in the business of selling stucco, adhesives, or membranes on a wholesale or retail basis"); or

- the product becomes an integral part of the building being constructed, *Calloway v. City of Reno*, 993 P.2d 1259, 1272 & n.5 (Nev. 2000) (holding that a contractor who merely installs products as part of a construction project "is not engaged in the business" of selling the products and therefore not a seller subject to strict liability).

We rejected some of these very reasons in *Fresh Coat* when we specifically held that the Act does not exclude those that provide construction services from being a "seller," even when the product is used in and incorporated into a building project. *Fresh Coat*, 318 S.W.3d at 899. Instead

---

example, a claim asserting "defective installation might be considered a service, since [the installation] occurred at a location accessible to the consumer after he had selected the plumber." *Id.* at 430. A claim asserting a "defect in the water heater, however, would subject the consumer to the obstacles of proof that make product injuries special, and might therefore be governed by strict liability," so "the plumber would be treated like a [seller] of a defective product." *Id.* Even in cases that involve "homogeneous transactions" implicating both a product and a service, he suggested "a court might distinguish between causes of an injury that are local and contemporaneous (such as failure to rectify a sagging transmission line) and those that are remote and ancient (such as engineering studies concerning the location of water wells)." *Id.* at 432. In his view, "the proof rationale at least provides courts with a co-herent, workable method of analyzing cases that are on the border between products and services." *Id.*

of relying on those extra-jurisdictional cases, I find better guidance in this Court's own decisions.

First, in *Barbee v. Rogers*, 425 S.W.2d 342, 346 & n.3 (Tex. 1968), the Court addressed whether an optometrist was a "seller" of contact lenses subject to strict liability under the common law. In answering that question, the Court focused on the plaintiff's allegations to determine whether he alleged that his injuries resulted from defective optometry services or a defective product. *Id.* at 346. The Court concluded that the optometrist could not be strictly liable as a seller because the plaintiff in that case attributed the injury not "to the product itself, i.e., the contact lenses, but to the professional and statutorily authorized act of 'measuring the powers of vision' of [the plaintiff's] eyes and 'fitting lenses . . . to correct or remedy . . . (his) defect or abnormal condition of vision.'" *Id.* (alterations in original). In short, the alleged "miscarriage, if such there was, rests in the professional acts of Respondents and not in the commodity they prescribed, fitted[,] and sold." *Id.* Because the plaintiff complained not of "the act of one selling a 'product in a defective condition unreasonably dangerous to the user,'" but instead complained of "the act of one deemed in law to have the competence to remedy a visual defect by furnishing particularly prescribed contact lenses," the Court concluded that the optometrist was not a seller subject to strict liability in that case. *Id.* Under the Court's reasoning in *Barbee*, if the plaintiff had alleged that the contact lenses were defective, rather than the optometrist's services, the optometrist would have been a "seller" subject to strict liability even though the sales were incidental to the defendant's optometric services.[12]

---

[12] The Court rejects *Barbee* as authority because the Court did not expressly state in that case that the optometrist would have been a seller if the plaintiff had asserted product-liability claims against the optometrist, and because the Court "simply did not conduct" the incidental-sales analysis that it adopts and applies today. *Ante* at ___. The relevance of *Barbee*, however, is exactly that: in a common-law strict-liability context, the Court did *not* apply

Second, our more recent decision in *New Texas Auto Auction Services, L.P. v. Gomez de Hernandez*, 249 S.W.3d 400 (Tex. 2008), confirms that a party whose business involves transferring ownership of a product from itself to another party is a "seller" subject to strict liability under the common law. *Id.* at 404. The issue in *New Texas Auto* was whether an auctioneer that facilitated the sale of an allegedly defective automobile was a seller subject to strict liability under the common law. 249 S.W.3d at 401–02. In holding that the auctioneer was not such a seller, the Court noted that businesses that "*play only an incidental role* in a product's placement" (as opposed to the Court's holding that businesses that only engage in "incidental" sales of the product) are not sellers, and that strict liability "applies to those whose *business* is selling, not everyone who makes an occasional sale." *Id.* (first emphasis added). We reached that conclusion, however, not because auctioneers are not "engaged in the business" of selling, but because

---

the incidental-sales test the Court applies today, but focused instead on the plaintiff's allegations against the optometrist. *Barbee*, 425 S.W.2d at 346. Similar to the approach President Powers advocated, *see supra* note ___, the Court noted that the optometrist's business involved both the provision of optometry services and "a merchandising concern," *Barbee*, 425 S.W.2d at 345, and concluded that the optometrist was not a seller subject to strict liability in that particular case because the alleged liability was "not premised on any defect in the lenses as such" but on the services the optometrist provided, *id.* at 346.

As the following discussion of the Restatement's principles explains, this "proof rationale," based on the nature of the plaintiff's allegations against the party seeking indemnity, may answer the Court's illustration regarding hair salons and products. *See ante* at n.7. While the Court apparently doubts that we would hold that a hair stylist can be strictly liability as a seller of the products used when providing hair-styling services, our decision in *Barbee*, President Powers' proof rationale, and the Restatement all suggest that the law should hold the stylist liable *if*, for example, the customer alleges that the product was defectively designed or manufactured and damaged her hair or scalp. On the other hand, if the customer alleges that the product was defective because the stylist improperly used or applied it, these authorities suggest that we should not subject the stylist to strict liability as the product's seller. However we might decide that issue, the Court's illustration demonstrates why the Court should not rely on common-law strict-liability cases from other courts and jurisdictions to decide whether Centerpoint is a seller under the Products Liability Act, because for these purposes the Legislature has already decided that issue. The day may come when we must reconsider *Barbee*'s approach to deciding whether a service provider is subject to common-law strict liability as a seller of products provided in connection with its services. This, however, is not that day. As for whether the hair stylist would be a seller entitled to statutory indemnity under the Products Liability Act, we must at least agree that only the Act itself must provide the answer.

22

auctioneers generally do not sell at all. *Id.* at 404–05. "Auctioneers are usually neither buyers nor sellers, but agents for both." *Id.* at 401. Although "they are obviously engaged in sales," we explained, "the *only* thing they sell for their own account is their services; the items they auction are generally sold for others." *Id.* at 402 (emphasis added). The distinction we recognized in *New Texas Auto* between a "seller" and an auctioneer was in the fact that auctioneers are not "engaged in the business of *selling* or otherwise *distributing* products" because an auctioneer neither "transfers ownership" nor "provides the product." *Id.* at 404 (quoting RESTATEMENT (THIRD) OF TORTS § 1 (AM. LAW. INST. 1998)). A seller, in other words, is one who passes title from itself to another, not one who assists with or facilities such a transaction for another. *Id.* at 404–05.

Once the Court identified that distinction in *New Texas Auto*, it then noted that the auctioneer in that case had in fact "actually held title to the [allegedly defective automobile] when it was finally sold at auction." *Id.* at 405. Thus, that auctioneer was in fact the "seller" in that particular transaction. *See id.* But "it was undisputed that [the auctioneer] normally never took title to the cars it auctioned, and did so here only because an arbitrator ordered it to do so." *Id.* Because sellers subject to strict liability are "those whose *business* is selling, not everyone who makes an occasional sale," the Court concluded that the auctioneer in that case was not subject to strict liability even though it actually sold the vehicle in that case. *Id.* at 405–06. The Court reached that conclusion not because the sale in that case was only "incidental" to the auctioneer's services, but because the auctioneer "normally never" engaged in such sales at all. *Id.* at 404–05.

In discussing these principles in *New Texas Auto*, the Court relied heavily on the Restatement (Third) of Torts. The Restatement supports the proposition that a service provider that also distributes products can be a "seller" subject to strict liability under the common law. It begins

23

with the unremarkable principle: "Services, even when provided commercially, are not products." RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 19 (1998). But it rejects the notion that one who provides a service is not a seller of products used in the provision of the service. To the contrary, the Restatement explains, "When a building contractor sells a building that contains a variety of appliances or other manufactured equipment, the builder, together with the equipment manufacturer and other distributors, are held as product sellers with respect to such equipment notwithstanding the fact that the built-in equipment may have become, for other legal purposes, attachments to and thus part of the underlying real property." *Id.* § 19 cmt. e.

Thus, for example, "one who contracts to inspect, repair, and maintain machinery owned and operated by another is the provider of a product-related service rather than the provider of a product." *Id.* § 19 cmt. f. However, if "a product repairer replaces a worn-out component part with a new part, the replacement constitutes a sale of the part . . . ." *Id.* And one "sells or otherwise distributes a product when, in a commercial transaction, one provides a combination of products and services and either the transaction taken as a whole, or the product component thereof," constitutes a commercial sale or distribution of the product. *Id.* § 20(c). When a service-provider sells or provides a product that is "consumed or permanently transferred to the customer" in connection with the service, "the transaction ordinarily is treated as a sale of the material that is consumed in providing the service," and this is true "[e]ven when the service provider does not charge the customer separately" for the product. *Id.* § 20 cmt. d. In short, as we noted in *Fresh Coat*, the Restatement "recognizes that a product seller may also provide services." 318 S.W.3d at 899.

Ultimately, however, the Court need not and should not decide in this case whether Centerpoint was a "seller" subject to strict liability under the common law. The issue before us is whether Centerpoint is a "seller" who is entitled to indemnity under the Products Liability Act. The Court appears to equate the two today. *See ante* at n.5 (suggesting that "by arguing that it is a seller for statutory-indemnity purposes, Centerpoint is essentially conceding that it would be a seller for purposes of a strict-liability claim brought by an injured party"). As we noted in *New Texas Auto*, however, the Products Liability Act "was not intended to replace [the Restatement] or the common law except in limited circumstances[, and] its broad definitions were drafted to provide indemnity for all retailers, even if they are not proper defendants in an underlying products claim." 249 S.W.3d at 405 (citing *Fitzgerald*, 996 S.W.2d at 867 (holding defendant who did not sell product that injured plaintiff was nevertheless entitled to indemnity)).

For these reasons, the Court's reliance on other courts' decisions addressing the common-law strict-liability question is unconvincing, not only because they address the common-law question, but also because they are inconsistent with this Court's own prior decision in *Barbee* and the Restatement's guidance. Ultimately, however unclear and unsettled the common-law question may be in Texas or throughout the country, the question before us is not what the common law should be, but what Texas statutory law is. Even if the Court desires to limit the scope of the Product Liability Act's definition of "seller," we must apply the Act as written in this case, not announce common-law principles. "[A]s with any statute, we begin with the text," *City of DeSoto v. White*, 288 S.W.3d 389, 395 (Tex. 2009), and when "the statute's language is unambiguous and does not lead to absurd results, our search also ends there: 'Where text is clear, text is determinative.'" *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 362 (Tex. 2013)

25

(quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009)). In short, the statutory definition—and "only" that definition—should control our decision in this case. *Needham*, 82 S.W.3d at 318.

## V.
## Conclusion

As part of its regular business for financial gain, Centerpoint contracted to transfer title of an allegedly defective truss from itself to Glenmont. It was thus a seller of the truss and not merely a facilitator of the sale. And making such sales was a regular part of the business in which Centerpoint was engaged. The summary judgment evidence in this case conclusively established that Centerpoint was "engaged in the business of distributing or otherwise placing" trusses "in the stream of commerce for use or consumption" and for a "commercial purpose." TEX. CIV. PRAC. & REM. CODE § 82.001(3). It was thus a "seller" under the Product Liability Act's plain language.

Of course, the Legislature could have defined the term "seller" to include only those who are "primarily" engaged in the business of distributing an allegedly defective product, who do not make such sales only "incidentally" as part of other business activities, who price the product to "achieve a profit" or "gain," or who do not sell "innumerable" other products in conjunction with the provision of a service. But it did not. Because the Court concludes that Centerpoint was not a seller when the Products Liability Act plainly says that it was, I respectfully dissent.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 17, 2016

26