**NEW TEXAS AUTO AUCTION SERVICES, L.P. d/b/a Big H Auto Auction, Petitioner**

v.

**Graciela GOMEZ DE HERNANDEZ, et al, Respondents.**

No. 06–0550.

Supreme Court of Texas.

Argued Oct. 17, 2007.

Decided March 28, 2008.

Scott T. Clark, Roger W. Hughes, Craig H. Vittitoe, Adams & Graham, L.L.P., Harlingen, TX, for Petitioner.

Rebecca E. Hamilton, Sumner, Schick & Hamilton, Dallas, Steve T. Hastings, Hastings Law Firm, Corpus Christi, Victor M. Carrera, Law Offices of Victor M. Carrera, P.C., Ramon Garcia, Law Offices of Tamon Garcia, P.C., Edinburg, Rosendo Almaraz Jr., Huerta Law Firm, L.L.P., Weslaco, TX, for Respondents.

Phillip Dye Jr., Vinson & Elkins, L.L.P., Houston, Brendan K. McBride, Prichard Hawkins McFarland & Young, L.L.P., San Antonio, Michael W. Dunagan, Jameson & Dunagan, P.C., Dallas, Kathleen Cassidy Goodman, Boerne, TX, for Amicus Curiae.

JUSTICE BRISTER delivered the opinion of the Court.

 Auctioneers are usually neither buyers nor sellers, but agents for both.[1]

1. *Brock v. Jones,* 8 Tex. 78, 79–80 (1852) ("The auctioneer may be the agent of both

While they are obviously engaged in sales, the only thing they sell for their own account is their services; the items they auction are generally sold for others. In this case, the court of appeals held an auto auctioneer could be liable in both strict liability and negligence for auctioning a defective car. But product-liability law requires those who *place* products in the stream of commerce to stand behind them; it does not require everyone who *facilitates* the stream to do the same. Accordingly, we reverse.

## I. Background

The 1993 Ford Explorer at issue here was repossessed by a finance company, who consigned it for sale in Houston by Big H Auto Auction.[2] Big H sold the car at auction for $4,000 on October 12, 2000, receiving a fee of $145 from the seller and $90 from the buyer. When the buyer discovered a discrepancy in the car's odometer,[3] a quick arbitration was held and an arbitrator found Big H had made a clerical error, rescinded the sale, and ordered Big H to buy the car back. Big H took title to the car and sold it again at auction on October 17, 2000 for $3,100 to Houston Auto Auction, which auctioned the car a

week later to Progresso Motors,[4] which sold it three days later to Jose Angel Hernandez Gonzalez in Progresso, Texas. About a year later, Gonzalez was killed in a rollover accident in Mexico.

Twelve plaintiffs (Gonzalez's wife, parents, children, and six others whose relationship to him is unclear)[5] filed suit in Hidalgo County against the car manufacturer (Ford Motor Co.), tire manufacturer (Bridgestone/Firestone Corp.), Progresso Motors, and the two auto auctioneers. The trial court granted summary judgment for Big H and severed that claim. The court of appeals reversed, finding Big H was not entitled to summary judgment on either the plaintiffs' strict liability or negligence claims.[6] We address each claim in turn.

## II. Strict Liability

Modern American product-liability law is derived primarily from section 402A of the Second Restatement of Torts,[7] "the most influential section of any Restatement of the Law on any topic,"[8] and perhaps in all of tort jurisprudence.[9] This Court adopted section 402A in 1967 in

parties.").

**2.** Big H Auto Auction is the assumed name of defendant New Texas Auto Auction Services, L.P.

**3.** The car's mileage was listed as 34,075 miles rather than the actual 84,075 miles.

**4.** Progresso Motors is the assumed name of defendant Eleazar Perez.

**5.** The plaintiffs listed the surviving spouse as Graciela Gomez De Hernandez, her children Jose Angel Hernandez Gomez and Elizabeth Hernandez Gomez, another child Arely Hernandez, and his parents Olvido and Juan Hernandez; the last three have settled and are not involved in this appeal. Listed as intervenors below are Guillermo Mujica Gutierrez,

Marta Covarrubias Gutierrez, Juan Lorezo Gutierrez Hernandez, Victor Manuel Maldonado Castañon, Pedro Alfonso Castillo Cardenas, and Jacinto Loyde Frayde.

**6.** 193 S.W.3d 220.

**7.** Restatement (Second) of Torts § 402A (1965).

**8.** David G. Owen, *The Puzzle of Comment J*, 55 Hastings L.J. 1377, 1377 n. 1 (2004) (noting that "section 402A had been cited in judicial opinions more often than any other section of any Restatement").

**9.** 1 M. Stuart Madden, Products Liability § 6.1, at 190 (2d ed.1988) (calling section 402A "the most influential development ever experienced in tort jurisprudence").

*McKisson v. Sales Affiliates,* holding those who sell defective products strictly liable for physical harm they cause to consumers.[10]

From the beginning, section 402A did not apply to everyone. By its own terms, section 402A limits strict liability to those "engaged in the business of selling" a product:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is *engaged in the business of selling such a product,* and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.[11]

Like many other short statements of legal doctrine, this one has been construed through the years to mean both more and less than what the plain words appear to say. For example, although section 402A appears to limit recovery to users or consumers of a defective product, we long ago extended it to innocent bystanders as well.[12] Similarly, section 402A explicitly applies only to those whose business is "selling" a product, but from the outset we have applied it more broadly. Thus, in *McKisson* itself we held strictly liable a distributor who handed out free samples, reasoning that the samples were distributed with "the expectation of profiting therefrom through future sales." Since then, we have applied strict liability to manufacturers,[13] distributors,[14] lessors,[15] bailors,[16] and dealers.[17]

■ On the other hand, we have limited the scope of those "engaged in the business of selling" to those who actually placed a product in the stream of commerce.[18] "Imposition of strict liability demands more than an incidental role in the overall marketing program of the product."[19] An advertising agency that provides copy, a newspaper that distributes circulars, an internet provider that lists store locations, and a trucking business that makes deliveries all might be "engaged" in product sales, but they do not themselves sell the products. Since *McKisson,* we have applied strict liability only to businesses that are "in the same

---

**10.** 416 S.W.2d 787, 789 (Tex.1967).

**11.** RESTATEMENT (SECOND) OF TORTS § 402A(1) (emphasis added).

**12.** *Darryl v. Ford Motor Co.,* 440 S.W.2d 630, 633 (Tex.1969) ("We hold that recovery under the strict liability doctrine is not limited to users and consumers.").

**13.** *McKisson,* 416 S.W.2d at 790 n. 3 ("Strict liability in tort lies against a distributor as well as a manufacturer.").

**14.** *Id.* ("Strict liability in tort lies against a distributor as well as a manufacturer.").

**15.** *Rourke v. Garza,* 530 S.W.2d 794, 800 (Tex. 1975).

**16.** *See Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374, 377 (Tex.1978) (distinguishing cases in which bailment for mutual benefit accompanied a sale of goods or services, and thus fell under section 402A).

**17.** *Henderson v. Ford Motor Co.,* 519 S.W.2d 87, 92 (Tex.1974) ("The car manufacturer and its dealer are liable for unreasonably dangerous products....").

**18.** *See, e.g., Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 616 (Tex.1996) (holding section 402A inapplicable to company that licensed design but did not manufacture tire that caused injury); *Armstrong Rubber,* 570 S.W.2d at 376 (holding section 402A inapplicable to tire sent to test track for testing).

**19.** *Firestone Steel,* 927 S.W.2d at 616.

position as one who sells the product."[20]

The reason for this limitation arises from the justifications for strict liability itself, namely: (1) compensating injured consumers, (2) spreading potential losses, and (3) deterring future injuries.[21] Businesses that play only an incidental role in a product's placement are rarely in a position to deter future injuries by changing a product's design or warnings. If required to spread risks, they must do so across far more products than the one that was defective. And while many businesses may be able to pay compensation, consumers normally expect a product's manufacturer to be the one who stands behind it.

The Third Restatement of Torts adopted in 1998 recognized these developments in products law, expanding strict liability to those "engaged in the business of *selling* or otherwise *distributing* products,"[22] and defining those terms as a business that either "transfers ownership" or "provides the product."[23] In a comment, the Third Restatement specifically excluded auctioneers:

> Persons assisting or providing services to product distributors, while indirectly facilitating the commercial distribution of products, are not subject to liability under the rules of this Restatement. Thus, commercial firms engaged in advertising products are outside the rules of this Restatement, as are firms engaged exclusively in the financing of product sale or lease transactions. *Sales personnel and commercial auctioneers are also outside the rules of this Restatement.*[24]

Nevertheless, the court of appeals held section 402A applied to auctioneers because Texas law "requires only that the defendant be responsible for introducing the product into the stream of commerce."[25] It is true we have sometimes referred to strictly liable defendants as "introducing" products into the stream of commerce[26] although more often we have referred to them as "placing" them in that current[27] as has the Legislature.[28] But

---

**20.** *McKisson,* 416 S.W.2d at 792; *see FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 89 (Tex.2004) (holding section 402A inapplicable to trailers trucking company supplied for its drivers); *Firestone Steel,* 927 S.W.2d at 616 (holding section 402A inapplicable to tire designer that licensed concept royalty-free).

**21.** Restatement (Second) of Torts § 402A cmt. c (1965); W. Page Keeton et al., Prosser and Keeton on Torts § 98, at 692–93 (5th ed.1984); *see, e.g., Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 425 (Tex.1984) (noting that "failure to allocate accident costs in proportion to the parties' relative abilities to prevent or to reduce those costs is economically inefficient"); *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 750 (Tex.1980) ("One of the policy reasons for the doctrine of strict liability is that the manufacturer or supplier can spread the losses occasioned by the supplier's defective product"); *Mid Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.,* 572 S.W.2d 308, 312 (Tex.1978) ("Strict liability arose initially to compensate consumers for personal injuries caused by defective

products...."); George W. Conk, *Punctuated Equilibrium: Why Section 402A Flourished and the Third Restatement Languished,* 26 Rev. Litig. 799, 809–10 (2007); David Krump & Larry A. Maxwell, *Should Health Service Providers Be Strictly Liable for Product–Related Injuries? A Legal and Economic Analysis,* 36 Sw. L.J. 831, 848 (1982).

**22.** Restatement (Third) of Torts § 1 (1998).

**23.** *Id.* § 20.

**24.** *Id.* cmt. g (emphasis added).

**25.** 193 S.W.3d 220, 225–26.

**26.** *FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 88 (Tex.2004); *Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 616 (Tex.1996); *Rourke v. Garza,* 530 S.W.2d 794, 800 (Tex.1975).

**27.** *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 844 (Tex.2000); *Am. Tobacco Co., Inc. v.*

both concepts were intended to describe producers, not mere announcers like an auctioneer or an emcee at a trade show who "introduces" a product to a crowd but has nothing to do with making it.[29]

The court of appeals also pointed to chapter 82 of the Civil Practices and Remedies Code to support its conclusion. But that chapter was not intended to replace section 402A or the common law except in limited circumstances.[30] Moreover, its broad definitions were drafted to provide indemnity for all retailers, even if they are not proper defendants in an underlying products claim.[31] To the extent chapter 82 addresses product claims generally, it reflects a legislative intent to restrict liability for defective products to those who manufacture them.[32]

■ The Plaintiffs' counsel concedes that auctioneers are generally not sellers under section 402A, but distinguished this case because Big H actually held title to the Explorer when it was finally sold at auction. But it was undisputed that Big H normally never took title to the cars it auctioned, and did so here only because an arbitrator ordered it to do so. Section 402A applies to those whose *business* is selling, not everyone who makes an occasional sale.[33]

■ Courts in other jurisdictions have consistently held that auctioneers are not subject to section 402A.[34] We agree, and

---

*Grinnell*, 951 S.W.2d 420, 438 (Tex.1997); *Houston Lighting & Power Co. v. Reynolds*, 765 S.W.2d 784, 785 (Tex.1988); *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex.1984); *Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374, 376 (Tex.1978); *Gen. Motors Corp. v. Hopkins*, 548 S.W.2d 344, 352 (Tex. 1977).

**28.** *See* Tex. Civ. Prac. & Rem.Code § 82.001(3).

**29.** *See Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex.1989) ("A fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused the injury."); *see also Firestone Steel*, 927 S.W.2d at 614 ("It is not enough that the seller merely introduced products of similar design and manufacture into the stream of commerce.").

**30.** *See, e.g.,* Tex. Civ. Prac. & Rem.Code § 82.005(e) ("This section is not declarative, by implication or otherwise, of the common law with respect to any product and shall not be construed to restrict the courts of this state in developing the common law with respect to any product which is not subject to this section.").

**31.** *See, e.g., Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 867 (Tex. 1999) (holding defendant who did not sell product that injured plaintiff was nevertheless entitled to indemnity).

**32.** *See* Tex. Civ. Prac. & Rem.Code § 82.003(a) (providing that with certain exceptions, "[a] seller that did not manufacture a product is not liable for harm caused to the claimant by that product"). As this suit was filed in 2002, it is not governed by these provisions. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 23.02(c), 2003 Tex. Gen. Laws 899 ("An action filed before July 1, 2003, is governed by the law in effect immediately before the change in law made by [the above provisions], and that law is continued in effect for that purpose.").

**33.** Restatement (Second) of Torts § 402A cmt. f ("This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like."); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1219 (5th Cir.1985).

**34.** *Pelnar v. Rosen Sys., Inc.*, 964 F.Supp. 1277, 1281 (E.D.Wis.1997); *Antone v. Greater Ariz. Auto Auction*, 214 Ariz. 550, 155 P.3d 1074, 1079 (Ariz.Ct.App.2007); *Musser v. Vilsmeier Auction Co.*, 522 Pa. 367, 562 A.2d 279, 283 (1989); *Brejcha v. Wilson Mach., Inc.*, 160 Cal.App.3d 630, 206 Cal.Rptr. 688, 694 (1984); *Tauber–Arons Auctioneers Co. v.*

hold that because Big H was not in the business of selling automobiles for its own account, it cannot be held strictly liable.

## III. Negligence

■ The plaintiffs alleged Big H was negligent in failing to replace the tires on this Explorer pursuant to a recall issued a few weeks before the auction took place. We agree with the trial court that Big H had no such duty on the facts here.

■ The existence of a legal duty is a question of law for the court.[35] In determining whether a duty should be recognized, we consider a number of factors including the risk of injury compared to the burden on the defendant and social utility of the conduct involved.[36] We have also considered whether one party has superior knowledge of the risk, or a right to control the actor whose conduct precipitated the harm.[37]

Unquestionably, ignoring a recall may run the risk of severe injury. But there are a huge number of recalls,[38] and the risks they involve varies widely.[39] Federal law generally places the duty on manufac-

turers of products to report potential defects, notify the public, and make necessary repairs.[40]

By contrast, imposing a duty on auto auctioneers to discover and repair defects would require them to go into a side business other than their own. The evidence establishes that Big H auctions about 1,000 vehicles each week, with many of them moving on and off the premises in a matter of hours. It does not inspect or repair vehicles unless a customer specifically requests and pays for such services. Many of the cars sold at its auctions need repairs, and some have to be towed on and off the auction block.

Moreover, Big H does not sell to the public. Only licensed, bonded, commercial dealers are permitted to buy or sell vehicles at Big H's auctions. Accordingly, whatever access to recall information Big H may have, the dealers who buy at the auction, prepare the cars for display, and sell them to the public would have at least the same access. Moreover, Big H's knowledge is clearly inferior to that of the

---

*Superior Court*, 101 Cal.App.3d 268, 161 Cal. Rptr. 789, 798 (1980).

**35.** *Tri v. J.T.T.*, 162 S.W.3d 552, 563 (Tex. 2005).

**36.** *Edward D. Jones & Co. v. Fletcher*, 975 S.W.2d 539, 544 (Tex.1998); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990).

**37.** *Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993).

**38.** The National Highway Traffic Safety Administration reports that since 1966 more than 390 million cars, trucks, buses, recreational vehicles, motorcycles, and mopeds, as well as 46 million tires, 66 million pieces of motor-vehicle equipment, and 42 million child safety seats have been recalled. *See* Nat'l Highway Traffic Safety Admin., Motor Vehicle Safety Defects and Recalls: What Every Vehicle Owner Should Know I (2006),

*available at* http://wwwodi.nhtsa.dot.gov/recalls/recallprocess.cfm.

**39.** *See id.* at 3 (listing safety-related defects including steering defects that may cause loss of control, fuel-system defects resulting in potential for fire, cooling-fan defects that could injure mechanics working on engines, and windshield-wiper defects).

**40.** *See, e.g.,* 15 U.S.C. § 2064(b)(2), (b)(3) (stating that if manufacturer becomes aware of substantial product hazard, it must immediately inform Consumer Product Safety Commission who may order the product repaired, replaced, or refunded); 40 C.F.R. § 159.184(a), (b) (recognizing manufacturer's duty to report incidents involving pesticide's toxic effects that may not be adequately reflected on its labels); 14 C.F.R. § 21.3 (imposing on aviation manufacturers an affirmative duty to report failures of parts it manufactures).

car and tire manufacturers the plaintiffs sued for these same defects, and there is no indication that Big H had any control over how those manufacturers made their products.

■ Additionally, Big H made no warranties of its own at the auction, serving merely as a conduit for warranties made by sellers. The car here was sold under a red light, indicating the car was being sold "as is." Generally, those who buy a product "as is" accept the risk of potential defects, and thus cannot claim a seller's negligence caused their injuries.[41] Imposing a different duty here would effectively prohibit car dealers from selling cars "as is." And as one federal court has pointed out, imposing such a duty on auctioneers would seem to require imposing it on every person who ever sold a used car, as there is "no sensible or just stopping point."[42] We decline to impose so sweeping a duty.

■ The plaintiffs' summary judgment response included deposition testimony from a representative of Houston Auto Auction (the buyer from Big H) that had he possessed actual knowledge of the defect here (which he denied), he would have done "something to at least give notice to the buyer that there are Firestone tires, don't drive on them, or take them off." But Houston Auto Auction was more than a mere auctioneer; its business included buying and selling cars for its own account,

and it made sales to the general public as well as dealers. Moreover, one's moral duty to warn of known dangers does not impose a legal duty to discover and remedy unknown dangers too.[43]

\* \* \*

Accordingly, the court of appeals erred in concluding Big H owed the plaintiffs a duty under either section 402A or in negligence. We reverse the court of appeals' judgment and reinstate the trial court's take-nothing judgment for Big H.

---

41. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995).

42. *Pelnar v. Rosen Sys., Inc.,* 964 F.Supp. 1277, 1284 (E.D.Wis.1997).

43. *See Buchanan v. Rose,* 138 Tex. 390, 159 S.W.2d 109, 110 (1942) ("[A] mere bystander who did not create the dangerous situation is not required to become the good Samaritan and prevent injury to others. Under the last rule, a bystander may watch a blind man or a child walk over a precipice, and yet he is not required to give warning. He may stand on the bank of a stream and see a man drowning, and although he holds in his hand a rope that could be used to rescue the man, yet he is not required to give assistance. He may owe a moral duty to warn the blind man or to assist the drowning man, but being a mere bystander, and in nowise responsible for the dangerous situation, he owes no legal duty to render assistance.").