# Supreme Court of Texas

No. 21-0496

Houston Area Safety Council, Inc. and
Psychemedics Corporation,

*Petitioners,*

v.

Guillermo M. Mendez,

*Respondent*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued October 25, 2022**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which Justice Blacklock, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined.

JUSTICE YOUNG filed a concurring opinion, in which Justice Blacklock joined.

JUSTICE BOYD filed a dissenting opinion, in which Justice Lehrmann and Justice Devine joined.

We are asked as a matter of first impression whether a third-party entity hired by an employer to collect and test an employee's

biological samples for drugs owes the employee a common-law duty to perform its services with reasonable care. Applying established principles, we conclude that the common law does not recognize such a duty. Accordingly, we reverse the court of appeals' judgment[1] and render judgment for Petitioners.

**I**

Guillermo Mendez, a pipefitter employed by Turnaround Welding Services, was assigned to work the Valero Ardmore Refinery. Following Valero policy for all on-site workers, Turnaround directed Mendez to report to the Houston Area Safety Council to provide hair and urine samples for drug and alcohol screenings. The Safety Council collected the samples from Mendez and delivered them to Psychemedics for laboratory testing. Psychemedics reported that Mendez's hair sample tested positive for cocaine and a cocaine metabolite.[2] Mendez had taken numerous drug tests over the more than 25 years he worked as a pipefitter and had never had a positive result. Mendez denies that he has ever used cocaine.

Valero required Mendez to provide a second sample to a different collection entity, DISA Global Solutions, which also sent the sample to Psychemedics for testing. The second sample tested negative for cocaine, as did a third that Mendez had tested by a different laboratory at his own expense. Mendez was required to complete a substance-abuse

---

[1] 634 S.W.3d 154, 163 (Tex. App.—Houston [1st Dist.] 2021).

[2] Metabolites are substances produced by the body when it breaks down a drug. *See Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 707 (Tex. 2003).

2

course, and when he did, DISA approved him to return to work. Nevertheless, Turnaround refused to reassign him to the Valero facility or to any other jobsite. After collecting unemployment benefits for a time, he found work with a different employer.

Mendez sued Turnaround in federal court and settled those claims. He then filed this suit against the Safety Council and Psychemedics, alleging that they negligently collected, transported, tested, and reported the results of his first hair sample, causing him to lose his job with Turnaround. The Safety Council and Psychemedics filed traditional and no-evidence summary-judgment motions, asserting that they did not owe Mendez a legal duty of care and that there is no evidence of breach, causation, or damages. The trial court granted the traditional summary-judgment motions, agreeing with the Safety Council and Psychemedics that they did not owe Mendez a legal duty.

The court of appeals reversed, holding that "when an individual is required, as a condition of employment, to submit to drug testing, the law recognizes a duty to use reasonable care in collecting and processing biological samples between third-party collection and testing agencies and the employees they test."[3] We granted the Safety Council's and Psychemedics' petitions for review.

## II

The existence of a legal duty, which is "a prerequisite to all tort

---

[3] 634 S.W.3d at 163.

3

liability",[4] is the "threshold inquiry in a negligence case".[5] Whether a legal duty exists under particular facts, and if so, the scope and elements of that duty, present questions of law that courts must decide.[6] To determine whether a particular defendant owes a negligence duty to a particular claimant, courts look first to whether we have previously held that a duty does or does not exist under the same or similar circumstances.[7] If, for example, a "special relationship" exists between the parties that we have previously held gives rise to a legal duty, that duty exists in the case presented as a matter of law, and "the duty analysis ends there."[8] But "[w]hen a duty has not been recognized in particular circumstances, the question is whether one should be."[9]

To determine whether a duty exists, we consider several interrelated factors we set out more than 30 years ago in *Greater*

---

[4] *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993).

[5] *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022) (quoting *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)); *see also Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983).

[6] *Kenyon*, 644 S.W.3d at 145; *see also Pagayon*, 536 S.W.3d at 503; *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009); *New Tex. Auto Auction Servs., L.P. v. Gomez De Hernandez*, 249 S.W.3d 400, 406 (Tex. 2008); *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 181 (Tex. 2004); *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 289 (Tex. 1996); *Phillips*, 801 S.W.2d at 525.

[7] *See Kenyon*, 644 S.W.3d at 145 (explaining that the duty inquiry involves evaluating the factual situation presented "in the broader context of similarly situated actors" (quoting *Pagayon*, 536 S.W.3d at 504)).

[8] *Golden Spread Council*, 926 S.W.2d at 292.

[9] *Pagayon*, 536 S.W.3d at 503.

4

*Houston Transportation Co. v. Phillips*, often referred to as the *Phillips* factors.[10] In undertaking this analysis, we weigh "the risk, foreseeability, and likelihood of injury . . . against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant."[11] We also consider "whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm."[12] We have said that some of these factors, like risk and foreseeability, "may turn on facts that cannot be determined as a matter of law and must instead be resolved by the factfinder", but these cases are unusual.[13] More often, "the material facts are either undisputed or can be viewed in the light required by the procedural posture of the case."[14] This is because "the factual situation presented must be evaluated in the broader context of similarly situated actors."[15] Thus, "[t]he question is whether a duty should be imposed in a defined class of

---

[10] *See* 801 S.W.2d at 525.

[11] *Kenyon*, 644 S.W.3d at 145 (quoting *Humble Sand & Gravel*, 146 S.W.3d at 182); *Phillips*, 801 S.W.2d at 525.

[12] *Kenyon*, 644 S.W.3d at 145 (quoting *Humble Sand & Gravel*, 146 S.W.3d at 182); *see also Pagayon*, 536 S.W.3d at 504; *Nabors Drilling*, 288 S.W.3d at 410; *New Tex. Auto Auction*, 249 S.W.3d at 406; *Golden Spread Council*, 926 S.W.2d at 290; *Graff*, 858 S.W.2d at 920; *Phillips*, 801 S.W.2d at 525.

[13] *Pagayon*, 536 S.W.3d at 504 (quoting *Humble Sand & Gravel*, 146 S.W.3d at 182).

[14] *Id.*

[15] *Id.*

5

cases, not whether the facts of the case at hand show a breach."[16]

### III

### A

The Safety Council and Psychemedics argue that we need not consider the *Phillips* factors to determine whether they owed Mendez a legal duty because we have already twice refused to recognize such a duty in the drug-testing context in *Mission Petroleum Carriers, Inc. v. Solomon*[17] and *SmithKline Beecham Corp. v. Doe*.[18] We disagree. Although those cases involved negligence claims arising from circumstances involving drug-testing activities—and although we held in both cases that no duty existed—we have not addressed in any case the specific duty Mendez argues exists here.

In *SmithKline,* we considered whether an independent drug-testing laboratory similar to Psychemedics, which was hired by an employer to test prospective employees' biological samples, "owe[d] a person tested a duty to tell that person or the employer that ingestion of certain substances will cause a positive test result."[19] The claimant, who lost her job after testing positive for opiates, did not complain that the

---

[16] *Id.* The concurrence argues that the *Phillips* factors facilitated judicial restraint when they were adopted. *Post* at 8 (Young, J., concurring). "The irony is," the concurrence explains, "that the dissent would harness the *Phillips* factors in service of the repudiated vision of an invasive judiciary, when the point of *Phillips* was to do the opposite." *Id.* at 10. We agree. But no party here has asked us to revisit the *Phillips* factors, and we apply them in accordance with our precedent.

[17] 106 S.W.3d 705.

[18] 903 S.W.2d 347 (Tex. 1995).

[19] *Id.* at 348.

6

laboratory improperly performed the test or reported an incorrect result but instead complained that it "should have informed her and her prospective employer that eating poppy seeds could cause a positive test result."[20]

After concluding that no court had previously recognized such a duty,[21] we considered the *Phillips* factors and concluded they did not support recognizing the duty the claimant proposed.[22] Although we acknowledged that the claimant's job loss was, at least to some degree, a likely and foreseeable result of the laboratory's failure to warn her not to ingest poppy seeds before taking the test, we found that other considerations outweighed those concerns. Specifically, we concluded that the proposed duty could not be "readily defined" and was "unworkable"; that it would require the laboratory to fulfill responsibilities that, under its contractual agreement, belonged to the claimant's employer; and that it would "impinge[] on the liability of other professionals for services rendered."[23] Importantly, we concluded our duty analysis in *SmithKline* by "emphasiz[ing] that we have not considered whether a drug testing laboratory . . . has a duty to use reasonable care in performing tests and reporting the results."[24]

---

[20] *Id.*

[21] *Id.* at 351.

[22] *Id.* at 353-354; *see also id.* at 353 (declining to find a duty among the "very general principles" in *Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942), regarding a duty to prevent injury in a negligently created dangerous situation).

[23] *Id.* at 353-354.

[24] *Id.* at 355.

7

Several years after our decision in *SmithKline*, we came closer to addressing today's issue in *Mission Petroleum*. But *Mission Petroleum* did not involve an independent laboratory that tested employees' samples for an employer (like Psychemedics or SmithKline) or an independent entity that collected and transported employees' samples for an employer (like the Safety Council). Instead, the claimant in *Mission Petroleum* asserted a negligence claim against the employer—which itself collected the employee's urine sample—alleging that it failed to use reasonable care in doing so, resulting in a false-positive test result.[25] The issue we addressed in *Mission Petroleum* was "whether *an employer* owes a duty to an at-will employee to use reasonable care when collecting an employee's urine sample for drug testing pursuant to [Department of Transportation (DOT)] regulations."[26] We began our analysis in *Mission Petroleum* by noting that we had declined in *SmithKline* "to address any duty the employer may owe to an employee and expressly reserved the question whether a laboratory may be liable for performing drug tests negligently."[27] And we emphasized that the question of whether a third-party entity that collects employees' samples owes a duty of care to the employees was "not before [the] Court."[28] Instead, *Mission Petroleum* required us to decide "whether an *employer* owes a duty of care when the employer itself collects the

---

[25] 106 S.W.3d at 710.

[26] *Id.* (emphasis added).

[27] *Id.*

[28] *Id.* at 711.

8

employees' urine samples."[29]

In holding that the employer did not owe such a duty, we acknowledged that an employer's negligence in such circumstances creates a risk of harm and a likelihood of injury, but we concluded that the DOT regulations substantially reduced the risk and likelihood of harm to tested employees by "impos[ing] stringent rules" for the process, "levy[ing] civil penalties for violation[s]", and providing "a safe harbor for employees whose test results are tainted by unacceptable breaches of collection procedures."[30] We also considered how creating such a common-law duty on the part of an employer could undermine Texas' fundamental employment-at-will doctrine, since the employee's claim "concern[ed] the process by which [his employer] chose to terminate him".[31]

Balancing the risk and likelihood of harm against the social value of employee drug testing and the employment-at-will doctrine, we "decline[d] to impose a common-law duty on employers who conduct in-house urine specimen collection under the DOT regulations."[32] But we expressly did not address whether third-party companies like the Safety Council and Psychemedics owe a common-law negligence duty to the employees of their clients.[33] Until today, that has remained an open question in this Court.

---

[29] *Id.* (emphasis added).

[30] *Id.* at 713-715.

[31] *Id.* at 715.

[32] *Id.*

[33] *See id.* at 711.

9

## B

When deciding whether to recognize a common-law duty, we consider "not only the law and policies of this State, but the law of other states and the United States, and the views of respected and authoritative restatements and commentators."[34] Lower courts around the country have split over the issue of whether third-party companies owe a common-law duty to their clients' employees to use reasonable care in collecting and testing their drug-testing samples.[35] Only five state high courts over 20 years have recognized such a duty.[36] Although no state high court has yet rejected such a duty, unlike the dissent, we do not regard the cases in a handful of states as approaching a consensus.[37]

After we decided *SmithKline*, the Fifth Circuit made an *Erie* guess in *Willis v. Roche Biomedical Laboratories, Inc.* that, under Texas law, an independent laboratory does *not* owe a legal duty "to persons tested to perform its services with reasonable care."[38] The court

---

[34] *SmithKline*, 903 S.W.2d at 351.

[35] *See Cooper v. Lab'y Corp. of Am. Holdings*, 150 F.3d 376, 379-380 (4th Cir. 1998) (collecting cases).

[36] *See Shaw v. Psychemedics Corp.*, 826 S.E.2d 281, 282 (S.C. 2019); *Landon v. Kroll Lab'y Specialists, Inc.*, 999 N.E.2d 1121, 1122 (N.Y. 2013); *Berry v. Nat'l Med. Servs., Inc.*, 257 P.3d 287, 291 (Kan. 2011); *Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215, 1221 (Pa. 2003); *Duncan v. Afton, Inc.*, 991 P.2d 739, 740 (Wyo. 1999).

[37] Moreover, as explained in Part V, *infra*, we find our own well-established tort jurisprudence persuasive and conclude that declining to recognize this duty is more consistent with the common law's treatment of analogous conduct.

[38] 61 F.3d 313, 316 (5th Cir. 1995).

acknowledged that we noted in *SmithKline* that "some jurisdictions had held that a laboratory owes a duty to persons tested to perform its services with reasonable care" and that we "distinguish[ed] those decisions from the failure to warn claims" at issue in *SmithKline*.[39] Nevertheless, the court concluded that our opinion in *SmithKline* "seemed to question the soundness of the decisions finding such a duty", particularly by making "unfavorable references" to the original panel opinion, which was withdrawn and replaced with a substituted opinion.[40] The court concluded that under Texas law, the laboratory owed the employee "no duty of reasonable care in testing his urine for drugs."[41] As a result, the Fifth Circuit and its district courts have followed *Willis*' holding that under Texas law, an independent laboratory does not have a legal duty to a person whose specimens are tested to exercise reasonable care when conducting those tests.[42]

Until today, however, this Court has not addressed the issue presented in this case.

## IV

With these principles and precedents in mind, we turn to the

---

[39] *Id.*

[40] *Id.* at 316 & n.2; *Willis v. Roche Biomed. Lab'ys*, 21 F.3d 1368 (5th Cir. 1994).

[41] *Willis*, 61 F.3d at 316.

[42] *See, e.g., Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 730 (5th Cir. 2002); *Brownlow v. Lab'y Corp. of Am.*, 254 F.3d 1081, 2001 WL 563785, at \*1 (5th Cir. May 14, 2001); *Martinez v. DISA, Inc.*, 435 F. Supp. 3d 747, 753 (W.D. Tex. 2020); *Hinds v. Baker Hughes, Inc.*, MO-06-CV-134, 2007 WL 9710941, at \*3 (W.D. Tex. Sept. 28, 2007); *Frank v. Delta Airlines, Inc.*, No. 3:00-CV-2772, 2001 WL 910386, at \*2 (N.D. Tex. Aug. 3, 2001).

question whether to recognize the legal duty Mendez proposes under the *Phillips* factors.

We first consider the risk, foreseeability, and likelihood of injury that Mendez would suffer as a result of the negligent collection and testing of his samples.[43] We have noted before the "serious risk that an employee can be harmed by a false positive drug test."[44] In this case, for example, Mendez testified that not only was he not allowed to return to the jobsite where he was working at the time of his positive drug test but that a second positive test would bar him from all future job prospects in his profession.

In *Mission Petroleum*, we noted that the DOT's "comprehensive statutory and regulatory scheme" afforded employees "significant protection" from that risk.[45] We concluded that the DOT regulations struck the appropriate balance between the need for efficient drug testing and protections for employees to insist on the integrity of the process.[46] The DOT regulations do not apply in this case, but test subjects have similar protections. As in *Mission Petroleum*, Psychemedics reviews the chain of custody before testing the sample, and an independent medical review officer verifies the test results. In the event of a positive test result, the medical review officer contacts the test subject to give the subject an opportunity to explain the test result. Additionally, DISA provides procedural protections such as retesting

---

[43] *See Phillips*, 801 S.W.2d at 525.

[44] *Mission Petroleum*, 106 S.W.3d at 714-715.

[45] *Id.* at 715.

[46] *Id.*

12

and a substance abuse program. Finally, Psychemedics notes that its conduct is in fact highly regulated: it is licensed, certified, and regulated by numerous federal and state governmental agencies, some of which have evaluated and approved its testing procedures.

In light of these protections, Petitioners argue that the nature and likelihood of risk arising from supposed contamination are minimal. According to them, Psychemedics' washing and testing procedure eliminates contaminants, making the risk "essentially non-existent." And in light of the contaminant-eliminating procedures and the additional procedural protections, Petitioners argue that they could not have reasonably anticipated a false positive or that Turnaround would have fired Mendez. However, as in *SmithKline*, we assume that there is a significant likelihood that Petitioners could and did foresee the injury—Psychemedics' specimen custody and control form, completed by a Safety Council employee, has a box for "Pre-Employment" testing purposes, which was checked.[47] And the test results delivered to Mendez's employer also noted that the "Test Use" was for "Pre-Employment" purposes. But this does not end the inquiry.[48]

We next balance the risk, foreseeability, and likelihood of injury

---

[47] *See SmithKline*, 903 S.W.2d at 353. The dissent faults us for "assum[ing]" that there is a significant likelihood of foreseeable injury. *Post* at 7 (Boyd, J., dissenting). Rather than accept Psychemedics' contention that it has "never had a false positive" in over nine million tests, we assume without deciding that a false-positive result is possible and is a foreseeable harm. We have no occasion in this case to opine on the truth of Psychemedics' infallibility claim, although we note that the summary-judgment evidence suggests a high degree of accuracy in its testing methods.

[48] *See SmithKline*, 903 S.W.2d at 353 ("Foreseeability alone, however, is not sufficient to create a new duty.").

against the social utility of the Petitioners' services and the magnitude and consequences of the burden the legal duty would impose on them. We conclude that the balance of these countervailing factors does not counsel recognition of a new common-law duty.

There is great social utility in drug testing employees, particularly those engaged in occupations that present substantial dangers to themselves, other employees, property, and the public. Petitioners contend that the importance of drug testing and the burden to be imposed on them far outweigh the risk of harm to individual employees. For one, they argue that imposing the duty will produce a flood of frivolous and burdensome claims against them for every employee who receives a positive test result. According to them, employees will be able to sue the collection facility or laboratory claiming that they do not do drugs, so the test result *must* be a false positive.

The court of appeals concluded that the Safety Council and Psychemedics are in the best position to guard against the injury to employees because they are solely responsible for collecting, testing, and the quality control process, and they are "better able to bear the burden financially than an individual employee harmed by a false positive report."[49] Further, the court reasoned that "[a]ccuracy of collection and testing . . . is of paramount importance to the business success of both [the Safety Council] and Psychemedics" and that "[c]ontrolling their processes to ensure accurate results is a good business practice as

---

[49] 634 S.W.3d at 162-163.

14

employers have an interest in receiving accurate testing results."[50]

But the Petitioners counter that Mendez's proposed duty is inappropriate because the Safety Council has no control over an employer's response to an employee's drug-test results. Any harm an employee sustains as the result of a false-positive drug test necessarily depends not on an independent entity that collects or tests the sample but on whether and how the employer chooses to terminate or discipline the employee in response to the test result. Neither the Safety Council nor Psychemedics provides any recommendation to employers about what to do with the test results. Nor do Petitioners have any direct relationship with an employee whose samples they collect or test.[51] And when a case involves an at-will employee like Mendez, the employer can terminate the employee for almost any reason, and a third-party entity has no control over that decision.

Further, if faced with this burden, Petitioners contend that third-party facilities may instead "seek to transfer responsibility to employers through indemnity agreements, drastically increase the price, or choose not to collect samples for use in the employment context." This could lead to a decline in employment drug screens, or employers may be charged more for drug-screening tests, which could lead to employers assuming control over the drug-testing program themselves. Petitioners note that should employers assume control over testing programs, it

---

[50] *Id.* at 162.

[51] *See Mission Petroleum*, 106 S.W.3d at 710-711 (noting that Texas courts have rejected a laboratory's duty of care because "drug-testing companies have a direct relationship only with the employer and not the employee"); *see also infra* Part V.

may erode the employment-at-will doctrine. If third-party entities can be liable for negligently collecting and testing employee drug samples, then employers who themselves collect or test such samples may ultimately face the same liabilities.[52] As we recognized in *Mission Petroleum*, "[w]e must also balance any risk to employees against the burden it could place on our employment-at-will doctrine."[53] Although not directly implicated here,[54] "we must consider [Mendez's] claim in its overall context."[55]

## V

Declining to recognize the proposed duty is consistent with our existing tort law. Take defamation and the economic-loss rule, for example. In the defamation context, Texas law recognizes a "qualified privilege" that "protects a former employer's statements about a former employee to a prospective employer."[56] The privilege extends to a former

---

[52] As the dissent notes, we already decided in *Mission Petroleum* that employers owe no duty to employees when they perform drug testing themselves, at least in part because the employer is regulated. But it would make little sense that an employer—who has a direct relationship with the employee—has no duty to its employee, but a third-party entity—which has no relationship with the employee—does.

[53] 106 S.W.3d at 715.

[54] *See id.* ("We agree that the employment-at-will doctrine is not directly implicated here because Solomon has not sued for wrongful discharge.").

[55] *Id.*

[56] *Smith v. Holley*, 827 S.W.2d 433, 436 (Tex. App.—San Antonio 1992, writ denied). Our Court has not addressed the validity of the qualified privilege in this precise context, but it has recognized the qualified privilege in a similar employment context. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d

16

employer's "communications made in good faith on subject matter in which the author has a common interest with the other person, or with reference to which he has a duty to communicate to the other person."[57] It is widely recognized that "common interest" includes a prospective employer's inquiry to a prospective employee's former employer about that individual as an employee.[58] An employee can defeat the privilege

640, 646-647 (Tex. 1995) (applying the qualified privilege to employer investigations of employee wrongdoing). And the specific former-to-prospective-employer privilege has been recognized by Texas courts of appeals and the Fifth Circuit since 1969 and 1997, respectively. *See Duncantell v. Universal Life Ins. Co.*, 446 S.W.2d 934, 937 (Tex. App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.); *Burch v. Coca–Cola Co.*, 119 F.3d 305, 323-326 (5th Cir. 1997). The Texas Labor Code also supports recognizing a qualified privilege for former or current employers. *See* TEX. LAB. CODE §§ 103.001-103.005; *see also id.* § 103.001 ("The legislature finds that the disclosure by an employer of truthful information regarding a current or former employee protects employment relationships and benefits the public welfare. It is the intent of the legislature that an employer who makes a disclosure based on information obtained by the employer that any employer would reasonably believe to be true should be immune from civil liability for that disclosure."); *id.* § 103.003 (authorizing employers to "disclose information about a current or former employee's job performance"); *id.* § 103.004 (granting immunity to employers that disclose information about an employee under Section 103.003 unless "the information disclosed was known by that employer to be false at the time the disclosure was made or that the disclosure was made with malice or in reckless disregard for the truth or falsity of the information disclosed").

[57] *Smith*, 827 S.W.2d at 436; *Patrick v. McGowan,* 104 S.W.3d 219, 223 (Tex. App.—Texarkana 2003, no pet.); *see also Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999) (explaining that the qualified privilege is recognized for "statements that occur under circumstances wherein any one of several persons having a common interest in a particular subject matter may reasonably believe that facts exist that another, sharing that common interest, is entitled to know" (quoting *Hanssen v. Our Redeemer Lutheran Church*, 938 S.W.2d 85, 92 (Tex. App.—Dallas 1996, writ denied))).

[58] *Pioneer Concrete of Tex., Inc. v. Allen*, 858 S.W.2d 47, 49 (Tex. App.—Houston [14th Dist.] 1993, writ denied); *Smith*, 827 S.W.2d at 436.

17

by proving actual malice.[59]

The reason for this privilege is clear. If an employer can be sued for speaking in good faith about its former employee to a prospective employer, the former employer might be hesitant to disclose important information about the employee's fitness, including information about past drug use. The third-party drug-testing companies at issue here are in a position similar to that held by former employers protected by the qualified privilege—assuming they are acting without malice, of which there is no allegation. The drug-testing companies are in possession of information that is damaging to the prospective employee's reputation but pertinent to the employee's fitness for the job. The common law already recognizes a qualified privilege shielding from liability the disclosure of similar information in other contexts. Declining to impose the requested duty on drug-testing companies thus conforms with the common law's treatment of analogous conduct and avoids imposing greater potential liability on drug-testing companies than on others who communicate with employers about prospective employees.

Similarly, although it is well recognized that one who undertakes services necessary for the protection of a third person and performs them negligently is subject to liability for that person's physical harm or property damage,[60] "[t]he law has long limited the recovery of purely

---

[59] *Pioneer Concrete of Tex.*, 858 S.W.2d at 49.

[60] *See Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex. 1991) (citing RESTATEMENT (SECOND) OF TORTS § 324A (AM. L. INST. 1965)).

economic damages in an action for negligence."[61] "[T]he extent to which Texas precludes recovery of economic damages in a negligence suit between contractual strangers" is not entirely clear,[62] but our courts of appeals "have uniformly . . . den[ied] recovery of purely economic losses in actions for negligent performance of services" absent "[p]rofessional malpractice", which is not at issue here.[63] The *Restatement (Third) of Torts: Liability for Economic Harm*, which we discussed extensively in *LAN/STV v. Martin K. Eby Construction Co.*, also limits liability for negligently performed services to "loss suffered (a) by the person or . . . group of persons for whose benefit the actor performs the service; and (b) through reliance upon [the service] in a transaction that the actor intends to influence."[64] In this case, the Safety Council and Psychemedics performed their collection and testing services for the benefit of Turnaround, not Mendez.

Considering the competing factors above—the risk to employees, public safety, existing protections and regulations, the possible burdens on third-party testing administrators, the employment-at-will doctrine—as well as our well-established tort principles, we hold that the third-party testing entities hired by an employer do not owe a

---

[61] *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 238 (Tex. 2014).

[62] *Id.* at 243.

[63] *Id.* at 243-244. We explained in *LAN/STV* that the analysis is somewhat different for claims of negligent misrepresentation. *Id.* at 244-249. But Mendez has not alleged such a claim.

[64] RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 6(2) (AM. L. INST. 2020).

common-law negligence duty to their clients' employees. Whether such a duty is desirable is a separate policy question for the Legislature, which can balance competing factors apart from the common law.

* * * * *

Accordingly, we reverse the court of appeals' judgment and render judgment for petitioners Safety Council and Psychemedics.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 23, 2023